[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15069

_____

D.C. Docket No. 3:10-cv-00085-MCR-CJK

IRA LEE MCQUEEN,

Plaintiff - Appellee- Cross-Appellant,

versus

SHEDRICK JOHNSON,
Deputy Sgt #127,
MICKEY A. O'REILLY, JR.,
Deputy Sheriff #200, et al.,

Defendants - Appellants- Cross-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

(February 5, 2013)

Before HULL, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

A series of unfortunate misunderstandings led to several officers of the Escambia County Sheriff's Office forcefully arresting Ira Lee McQueen, a plain-clothes officer with the Florida Department of Professional Regulation, Division of Alcoholic Beverages and Tobacco ("ABT").  An individual mistook McQueen for an armed robber when McQueen was in the process of securing the firearm of a liquor store clerk who had sold alcohol to a minor.  Police officers responding to the subsequent armed robbery call utilized tasers and a K-9 unit to subdue McQueen, who was visibly armed with two guns, as he exited the liquor store while talking on the phone.  McQueen sued the officers who used the tasers and K-9 in both their individual and official capacities, alleging excessive use of force under the Fourth Amendment, in addition to state law false imprisonment and battery claims.  The district court bifurcated discovery, and before us are only the claims against the officers in their individual capacities.  The district court granted in part and denied in part the officers' motions for summary judgment on qualified immunity grounds with regard to the individual-capacity Fourth Amendment claims. The officers appeal the district court's denial of summary judgment with respect to their actions after the initial tasing.  McQueen cross-appeals the district

2

court's partial grant of qualified immunity to Johnson with respect to the initial

tasing.    We conclude that the officers were entitled to qualified immunity on

those claims, and we therefore affirm in part and reverse in part the judgment of

the district court.

## I.

## A.

On October 28, 2008, Ira Lee McQueen was working undercover as an ABT

Special Agent attempting to find individuals violating Florida statutes related to

the sale of alcoholic beverages.[1]  McQueen and his partner, another undercover

ABT Special Agent named Tammy Richards, determined that the clerk at a liquor

---

[1]        "We resolve all issues of material fact in the [plaintiff's] favor and approach the facts from the [plaintiff's] perspective because '[t]he issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law.'" Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002)).  Thus, the operative facts at the summary judgment stage "may not be the 'actual' facts of the case." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 n.3 (11th Cir. 2000).  "[O]nce we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, . . . the reasonableness of [the defendants'] actions . . . is a pure question of law." Scott v. Harris, 550 U.S. 372, 381 n.8 (2007) (emphasis omitted).  Accordingly, the district court erred insofar as it concluded that "a jury reasonably could find that the use of any force after the initial tasing was excessive" and thus that genuine issues of material fact prevented it from entering summary judgment as to the reasonableness of the defendants' use of force.

store had illegally sold alcohol to an underage individual working in conjunction with McQueen and Richards. McQueen entered the liquor store, identified himself to the clerk with his state identification, and commenced a non-custodial arrest. The clerk questioned the identification of the minor, prompting Richards to leave the store to retrieve the minor's identification as proof. Subsequent questioning by McQueen during Richards's absence revealed that the clerk had a firearm in his pants. A video recording from the liquor store shows that the clerk placed his hands in the air as McQueen went behind the store counter to retrieve and secure the firearm. McQueen then returned to the front of the counter to continue the citation process.

A customer entered the store during the minimal time period in which Richards was absent and McQueen was retrieving and securing the clerk's weapon. The customer, believing that she was walking in on a robbery in progress, returned to the laundromat next store and told a laundromat employee to call the police. The Escambia County Sheriff's Office dispatcher alerted deputies to a possible armed robbery in progress at the liquor store. The dispatcher also provided the deputies with a description of the suspect (McQueen).

Meanwhile, McQueen was unloading the clerk's firearm and placing it in his jacket pocket as Richards returned to the store with the minor's identification.

4

McQueen then contacted the Sheriff's Office on the store's telephone to conduct a record check on the clerk. The individual who conducted such checks was not immediately reachable, so McQueen remained on the line while the police department attempted to locate the appropriate person.

Around this time, numerous police officers converged outside the liquor store. Officers called the store's phone, but the line was busy. They also observed a male (McQueen) matching the description of the suspect. Noticing the commotion, McQueen, Richards, and the clerk all moved closer to the glass storefront to see what was happening outside. The police officers saw the three individuals inside the store and began shouting commands to "show your hands," to "put down the phone," to "get on the ground," and eventually to "come out." Realizing that they were the cause of the heavily armed police presence, Richards, McQueen, and the clerk began yelling that Richards and McQueen were state officers.[2] All three individuals inside the store remained standing, looking outside. Although Richards could hear the commands of the police, McQueen

---

[2]    Although Richards, McQueen, and the clerk differed as to what exactly they yelled – McQueen said he was "from the beverage department," while both Richards and the clerk were saying that McQueen and Richards were with the "police" – it is clear that all three were yelling that Richards and McQueen were somehow involved with state authorities. At least one member of the Escambia County Sheriff's Office (Officer Jennifer Lovely) heard Richards's attempt to identify the occupants of the store, but the deputy did not communicate that information to anyone else.

5

could not.   Richards held her hands in front of her chest, occasionally pointing at what was happening outside.  The clerk put his arms straight up in the air. McQueen, however, continued to stand near the inside of the store's front door on the telephone.

McQueen exited the front door of the store in an attempt to identify himself. Still on the phone with his right hand, McQueen pushed open the door with his left.  The firearm that McQueen had taken from the store clerk remained visible in McQueen's right jacket pocket.  McQueen's second gun -- his own service firearm underneath his jacket -- also became visible to Deputy Sergeant Shedrick Johnson as McQueen exited the store.  The cacophony continued, with the officers yelling at McQueen to get off the phone and on the ground and McQueen screaming that he was "state police."  Officer Steve McCann was the only officer to hear McQueen, and he testified that he heard McQueen say in a conversational tone "I am a State Officer."  McQueen stopped several feet in front of the door of the liquor store and began to lower himself onto his knees, with the phone still in his right hand and his left hand free but visible.  Johnson, believing that McQueen was not being compliant with officers' commands, deployed his taser, striking

6

McQueen in the shoulder.  McQueen, incapacitated by the tasing, fell forward onto his hands.[3]

The police officers swarmed McQueen, whose hands remained underneath his body.  Four or five officers were on top of him, yelling at him to move his hands that remained out of sight.  Believing that McQueen was not being compliant in moving his hands, Johnson tased McQueen again approximately ten seconds after the first tasing.  Another officer removed the clerk's firearm from McQueen's jacket pocket and placed it a safe distance away.  At that point, Deputy Sheriff Jimmie Tatum and another officer (Richard Baily) noticed McQueen's other gun –  the service revolver –  that had gone unnoticed to all but Johnson.  Tatum and Baily yelled "gun," and Baily instructed Deputy Sheriff Mickey O'Reilly to tase McQueen.[4]  O'Reilly tased McQueen nearly simultaneously with Tatum releasing his K-9.[5]  The officers then successfully handcuffed McQueen.

---

[3]      Although McQueen testified in his deposition that his hands were visible above his body when he fell, his brief in this Court and his response to the defendants' motions for summary judgment state that his hands were beneath his body.  Additionally, the video of the incident indicates that McQueen's hands were not above his body.

[4]      Although Baily did not recall directing O'Reilly to tase McQueen, when asked whether this could have occurred, he stated, "Yes, sir, it could have happened, absolutely."

[5]      As the district court noted, the number of times a taser was used -- and by whom -- is not entirely clear.  McQueen testified in his deposition that he was tased three times; McQueen's motion in response to the defendants' motion for summary judgment claims that McQueen was tased four times (twice by Johnson and twice by O'Reilly); the defendants assert that McQueen was tased three times (twice by Johnson and once by O'Reilly); and McQueen's

7

Shortly thereafter, the police verified McQueen's identity through his credentials and Richards's statements. Only at this time did a few officers recognize McQueen. McQueen was then released and taken to the hospital, where he was treated for the taser wounds, dog bites, and injuries to his neck and ear. McQueen still continues to suffer neck pains, in addition to psychological and emotional problems such as anger, depression, paranoia, and nightmares.

B.

A threshold issue exists regarding the subject-matter jurisdiction of this Court: before us are both (1) an appeal from the district court's denial of qualified immunity to defendants Tatum, O'Reilly, and Johnson (to the extent of his activity after the initial tasing), and (2) a cross-appeal from the district court's partial grant of qualified immunity to Johnson with regard to his first use of the taser. Ordinarily, a court of appeals may review only the "final decisions of the district courts." 28 U.S.C. §1291. However, this Court has jurisdiction over the first appeal, concerning the denial of qualified immunity, pursuant to the collateral order doctrine. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985) (concluding that denial of qualified immunity defense is immediately appealable under the

---

brief in this appeal says that he was tased three times (twice by Johnson and once by O'Reilly). We conclude that the exact answer to this question is immaterial to the resolution of this appeal in light of the analysis below.

8

collateral order doctrine "to the extent that it turns on an issue of law"). McQueen's cross-appeal of the partial <u>grant</u> of qualified immunity to Johnson, however, does not fit within the collateral order doctrine's exception to the finality rule of 28 U.S.C. §1291 for appeals of <u>denials</u> of qualified immunity. <u>See</u> <u>Hudson v. Hall</u>, 231 F.3d 1289, 1293-94 (11th Cir. 2000).

However, McQueen's cross-appeal falls within our pendent appellate jurisdiction. "Under the pendent appellate jurisdiction doctrine, we may address otherwise non-appealable orders if they are 'inextricably intertwined' with an appealable decision or if 'review of the former decision is necessary to ensure meaningful review of the latter.'" <u>Id.</u> at 1294 (quotation marks and alterations omitted); <u>see also</u> <u>Swint v. Chambers Cnty. Comm'n</u>, 514 U.S. 35, 51 (1995). Both of these criteria are met here. It is necessary to determine the reasonableness of Johnson's initial use of force in order to determine whether the subsequent uses of force by Johnson, O'Reilly, and Tatum mere seconds later were reasonable. <u>Cf.</u> <u>Hudson</u>, 231 F.3d at 1293-94 & n.4 (concluding that court of appeals had pendent appellate jurisdiction over appeal of partial grant of qualified immunity to officer for traffic stop when officer appealed partial denial of qualified immunity for subsequent searches of the persons of the stopped vehicle's occupants).

9

Accordingly, we have jurisdiction over McQueen's cross-appeal regarding the partial grant of qualified immunity to Johnson.

II.

"We review de novo a district court's resolution of qualified immunity on summary judgment." Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012). Qualified immunity "offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known," Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quotation marks omitted), "protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law," Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012) (quotation marks omitted). If the public official first shows that he was acting within the scope of his discretionary authority -- a burden undisputedly met by the defendants here -- the burden shifts to the plaintiff to establish that qualified immunity is not appropriate. Id. at 1250. To determine whether a plaintiff has met his burden, a court must both "decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of [defendants'] alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009). A court may undertake these two

10

inquiries in either order.  Id. at 236.  We conclude that the defendants' uses of force were reasonable under McQueen's version of the facts, and the officers are accordingly entitled to qualified immunity.

McQueen argues that the actions of Johnson, O'Reilly, and Tatum constituted "excessive and unconstitutional force" under the Fourth Amendment. "[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989); accord Scott v. Harris, 550 U.S. 372, 383 (2007) ("[A]ll that matters is whether [the defendants'] actions were reasonable."). To assess the reasonableness of a seizure, "we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," Scott, 550 U.S. at 383 (2007) (alteration omitted), "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," Graham, 490 U.S. at 396.  In conducting this analysis, we adopt the viewpoint of  "a reasonable officer on the scene with knowledge of the attendant

11

circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." Terrell, 668 F.3d at 1251 (quoting McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009)); see also Graham, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments –  in circumstances that are tense, uncertain, and rapidly evolving –  about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. "[I]n the end," however, "we must still slosh our way through the factbound morass of 'reasonableness.'" Scott, 550 U.S. at 383.

Taking the plaintiff's facts from the perspective of a reasonable officer on the scene, we conclude that all three defendants acted reasonably under the circumstances. Three factors are particularly salient in reaching this conclusion. First, the officers were responding to an armed robbery call – a first-degree felony in Florida in which the suspect, by the very nature of the alleged crime, is expected to be armed with a dangerous weapon. See Fla. Stat. Ann. §812.13(2)(a)-(b). Additionally, it is undisputed that McQueen had two guns on him at the time, and the officers became aware of this fact at various times during the incident.

12

Second, McQueen – unlike the store clerk and Richards, who both had their hands up – decided to approach the officers while he was visibly armed and still holding the telephone.[6]  From a reasonable officer's perspective, McQueen was, at best, questionably compliant with the officers' commands.  While at least some of the officers were telling McQueen to exit the store, he was also told to get rid of the phone, to put his hands up, and to get on the ground.  Instead of doing so, McQueen exited the store, phone in hand and firearm apparent, and kneeled before being tased.  Observing the general compliance with their commands by Richards and the store clerk, the officers could reasonably conclude that the gist of their commands was audible and capable of being heeded, and that McQueen was failing to act accordingly.  Third, the officers utilized non-lethal force to subdue the visibly armed and only potentially compliant suspect.  Under these circumstances, Deputy Sergeant Johnson acted reasonably in initially tasing McQueen.  Cf. Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.").

---

[6]    It is undisputed that Richards and the store clerk followed commands to stay inside and put their hands up and were not harmed by the officers in any way.

13

The subsequent uses of force by Officers Johnson, O'Reilly, and Tatum were also objectively reasonable. As both the officers and McQueen agree, McQueen had the misfortune of falling on top of his hands after being incapacitated by Johnson's initial tasing. As a result, McQueen's hands were obscured under his body at the same time that the police were yelling at McQueen to reveal his hands, and many officers had already observed that there was a second weapon located in the same area as his hands. Despite McQueen's unfortunate inability to make his hands visible, a reasonable officer in this rapidly evolving situation could perceive that, rather than being incapacitated, the armed robbery suspect who undoubtedly had at least one firearm on his body was continuing to resist the officers' orders. Deputy Sergeant Johnson's second use of his taser – after reasonably believing that McQueen was being non-compliant and seeing that officers were still unable to handcuff him – was therefore reasonable. The reasonableness of this action was confirmed by the discovery of a second firearm – McQueen's service firearm – secreted in his belt shortly thereafter. After seeing this second weapon, Officers O'Reilly and Tatum, who had not seen the second firearm before and who could reasonably assume that McQueen was still not complying with the orders to make his hands visible, simultaneously tased the still-armed McQueen once more and released the K-9. Under these

14

circumstances, in which a second firearm was revealed within arm's reach and the armed robbery suspect's hands remained beneath him in close proximity to a second gun, the officers acted reasonably in using additional force to immobilize a questionably noncompliant McQueen.

McQueen argues that he posed no actual threat, that he was either attempting to or unable to comply with the officers' commands and was physically incapable of resisting, and that his self-identification as a state officer rendered the use of force by the police unnecessary. However accurate this argument may be in retrospect in this instance, it is not the correct perspective from which to assess Fourth Amendment excessive force qualified immunity claims. As the Supreme Court has made clear, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; see also Garczynski v. Bradshaw, 573 F.3d 1158, 1168 (11th Cir. 2009) ("Our task is not to evaluate what the officers could or should have done in hindsight."); Menuel v. City of Atlanta, 25 F.3d 990, 997 (11th Cir. 1994) ("Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer." (quoting Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994))). Police

15

officers, as in the situation at issue here, "are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396. While the police would have been safe in taking McQueen's assertions of state law enforcement employment[7] and passivity at face value this time, such statements would by no means necessarily be true in the next armed robbery call or situation in which an armed suspect's hands are concealed. Such a rule, in addition to contravening settled doctrine, would undermine the very purpose of qualified immunity, which "is to give meaning to the proposition that government officials are not required to err on the side of caution when it comes to avoiding constitutional violations." Crosby v. Monroe County, 394 F.3d 1328, 1334 (11th Cir. 2004) (quotation marks and alteration omitted).

The defendants' uses of force under these circumstances were reasonable under the Fourth Amendment, and they are therefore entitled to qualified immunity. We affirm the district court's partial grant of qualified immunity to Johnson with respect to the initial tasing. We reverse the district court's denial of

---

[7]    We note, again, that only one officer heard McQueen state that he was an officer as he exited the store.

16

summary judgment for all three officers with respect to their actions after the initial tasing.  We remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.