[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10183

_____

D.C. Docket No. 5:12-cv-00301-MTT

DELMA JACKSON,

Plaintiff-Appellee,

versus

WARDEN CARL HUMPHREY,
TIMOTHY WARD,
RANDY TILLMAN,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(January 13, 2015)

Before MARTIN, Circuit Judge, and EATON,[*] Judge, and HINKLE,[**] District Judge.

EATON, Judge:

Delma Jackson brought this civil rights action under 42 U.S.C. § 1983 alleging that the termination of her visitation privileges with her inmate husband was in retaliation for exercising her free speech rights under the First Amendment. Mrs. Jackson maintains that three Georgia Department of Corrections officials, prison warden Carl Humphrey, director of facilities Randy Tillman, and assistant commissioner Timothy Ward (the "Corrections officials"), terminated her visitation privileges as a consequence of her public protests of claimed constitutional violations committed by the Department of Corrections against her husband and other inmates. The District Court found that the Corrections officials were entitled to the protections of qualified immunity while her husband and the other inmates were engaged in a hunger strike, but not thereafter.

The Corrections officials now appeal the District Court's ruling, to the extent that it denied them summary judgment after the inmate's hunger strike ended, arguing that they enjoyed qualified immunity from suit for that period. We

---

[*] Honorable Richard K. Eaton, United States Court of International Trade Judge, sitting by designation.

[**] Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

agree, reverse, and remand to the District Court to enter judgment in the Corrections officials' favor.

I.

In June 2012, Mrs. Jackson's husband, Miguel Jackson, was confined to the Georgia Diagnostic and Classification Prison's Special Management Unit for maximum security inmates.[1]  The three Corrections officials are all employees of the Georgia Department of Corrections, located in Jackson, Georgia.

On about June 10, 2012, Mr. Jackson began refusing meals and shortly thereafter was deemed to be on a hunger strike.[2]  Five other inmates soon joined him.  The Corrections officials believed that Mr. Jackson encouraged the other inmates to refuse their meals, based on his statement to Warden Humphrey that he was the leader of the hunger strike.  In addition, Mr. Jackson testified at his

---

[1] The Special Management Unit includes six dormitories, each of which contains thirty-two single-inmate cells.  The inmates housed in the Special Management Unit are all maximum security inmates.

[2] According to the Georgia Department of Corrections' Standard Operating Procedure VH47-0002, an inmate is deemed to be on a hunger strike "after nine consecutive meals have been refused."  Pursuant to this procedure, "[i]nmates . . . who are mentally competent have the right to refuse to eat or take in liquids."  The procedure outlines the measures that the Department of Corrections must follow in the event of a hunger strike.  Specifically, once deemed to be on a hunger strike, an inmate must "be housed in a setting where the refusal or consumption of food can be observed and documented."  In addition to meals being continuously offered to a striking inmate, the inmate's "hydration and nutritional status [must] be assessed" regularly by a health care professional, and the inmate must "be weighed daily."  As a hunger strike progresses in length, physicians must "determine whether or not the facility is capable of providing an appropriate level of care to meet the inmate's . . . projected needs" and whether the inmate should "be transferred to another facility that can provide twenty-four hour medical observation and response."  Medical observation of an inmate can be ended only if the inmate "declares the hunger strike is over" or if the inmate "starts taking food and is medically stable."

deposition that he told other inmates that he was refusing food, and that his nickname was "Chief" because he had "a lot of influence" over the inmates. This claim, that Mr. Jackson was the leader of the hunger strike, was confirmed by other inmates.

On June 13, 2012, Warden Humphrey instructed the Department of Corrections staff to regularly monitor the striking inmates, which required that they be brought to the prison's medical unit each day to be weighed and have their vital signs measured. Two days later, Warden Humphrey met with each of these inmates individually, after which he informed Director Tillman that the inmates were on a hunger strike. On June 22, 2012, Mr. Jackson and another inmate refused measurement of their ketone and blood sugar levels.

Mrs. Jackson visited her husband at the prison over the weekend of June 23 and June 24, 2012. The following week, as the hunger strike persisted, Warden Humphrey directed his staff to suspend all visitation privileges,[3] aside from attorney visits, for each inmate participating in the strike. According to Warden Humphrey's affidavit, these inmates' visitation privileges were suspended for safety and security reasons, to avoid compromising the inmates' health, and to limit outside communication in an effort to contain the spread of the strike. Among other things, Warden Humphrey was concerned that the Special

_____

[3] The Georgia Department of Corrections' Standard Operating Procedure IIB01-0005 provides that "[v]isitation is a privilege for inmates and should not be considered a right."

4

Management Unit was unable to provide adequate security coverage and medical monitoring for the striking inmates.

On July 2, the striking inmates were moved to a secured area where they could be more closely monitored with regular checks by officers and nurses. Additional correctional officers were detailed, for security purposes, to escort the striking inmates to the medical unit. Warden Humphrey was also informed by medical staff that, if the hunger strike persisted, inmates would need to be housed in the infirmary, even though it was not equipped to hold maximum security inmates, so that they could receive intravenous injections and twenty-four-hour medical care.

Record evidence indicates that Director Tillman and Assistant Commissioner Ward read a June 26 report that made them aware that Mrs. Jackson had publicly criticized the Department of Corrections' treatment of her husband and other inmates housed in the Special Management Unit. On that day, while being examined at the medical unit by a doctor and nurse, and in response to being asked why he was refusing to eat, it was reported to Warden Humphrey and Director Tillman that Mr. Jackson stated "just watch the news Friday [June 29] between 12 & 2 and you will find out."

By June 27, 2012, five inmates, including Mr. Jackson, remained on strike. Three additional inmates stopped eating that day, and Mr. Jackson and another

5

inmate refused to go to the prison's medical unit.  On June 28, 2012, two of the striking inmates refused measurement of their blood sugar and ketone levels, and a third inmate joined Mr. Jackson and another inmate in refusing to visit the Special Management Unit's medical facility.

Shortly after the hunger strike began, prison officials began opening and reading Mr. Jackson's mail.  On June 28, 2012, Warden Humphrey forwarded a letter to Director Tillman that mentioned a rally planned for June 29 and that referenced the possibility that inmates at Augusta State Prison might begin striking as well.  On that same day, another internal report indicated that there were rumors that the hunger strike would spread to another wing of the Special Management Unit and to Macon State Prison, and that the inmates in that other wing were also "planning to attempt to disrupt the operations of the facility by resisting on the tray flaps, refusing to come off the recreation call, complaining of chest pains, etc."

On Friday, June 29, 2012, Mrs. Jackson led a public protest at the Georgia State Capitol seeking to build awareness about the prison's conditions.[4]  The record demonstrates that the Corrections officials received an e-mail later that day about the demonstration, which noted that Mrs. Jackson "gave testimony to the assembled group."  On July 2, 2012, Warden Humphrey ordered the striking

_____

[4] The conditions about which Mrs. Jackson and others protested included allegations that the Department of Corrections failed to provide inmates, who were being held at the prison's Special Management Unit, with access to personal hygiene items, sufficient yard time, appropriate medical treatment, and a thirty-day review of their imprisonment in the Special Management Unit, all as required by Department policy.

inmates to be moved to climate-controlled cells, and arranged for twenty-four-hour on-hand nursing staff and visual checks of each inmate at fifteen-minute intervals. On July 5, 2012, two more inmates joined the hunger strike and a third inmate missed his ninth straight meal, raising the total of striking inmates to eleven. The next day, Warden Humphrey met individually with each of the striking inmates. At the end of the meetings, each inmate, including Mr. Jackson, accepted a sack lunch. As a result, Warden Humphrey believed that the hunger strike was over and visitation privileges were restored to all striking inmates.

Mrs. Jackson visited with her husband over the weekend of July 7 and 8, 2012. On Monday, July 9, Warden Humphrey was informed that eight inmates, including Mr. Jackson, had refused all three of their meals that day. With the exception of attorney visits, visitation for each of these inmates was suspended. Also on July 9, Mrs. Jackson spoke at a second rally at the State Capitol. Warden Humphrey was informed that Mr. Jackson was the only one of the striking inmates who had received visitors during the preceding weekend, and forwarded this information to Director Tillman. Warden Humphrey also provided Director Tillman with a report that included an internet link to a news article discussing Mrs. Jackson's July 9 protest, and Warden Humphrey suggested that the protest "may be the reason the inmates continued the strike" and that the timing of Mrs. Jackson's weekend visit was significant.

7

On July 12, 2012, Director Tillman and Assistant Commissioner Ward received an e-mail detailing a recorded telephone call made that day by an inmate named Dexter Shaw. According to the e-mail, Mr. Shaw was recorded as saying that Mrs. Jackson had "allegedly told [Mr.] Jackson to keep the hunger strike going for ten more days until July 18" until she received written guarantees from the Governor of Georgia, with whom she sought a meeting, and from the Department of Corrections commissioner, that conditions at the prison would change.

On July 16, 2012, Mrs. Jackson spoke at a public demonstration at the Department of Corrections' headquarters. Both Warden Humphrey and Director Tillman were aware that she spoke at the demonstration. Following a meeting on July 18, 2012, Assistant Commissioner Ward ordered Warden Humphrey to revoke Mr. Jackson's visitation privileges with his wife. Although visitation for all striking inmates was already suspended, letters were sent to Mr. and Mrs. Jackson on July 19, 2012, informing them that Mrs. Jackson's visitation privileges were terminated.[5]

---

[5] The letters did not state the duration or reason for the termination. This omission appears to be in violation of the Georgia Department of Corrections' Standard Operating Procedure IIB01-0005 and the Georgia Department of Corrections' regulations, which require that such notifications state the reason for, and length of time for which, a name is removed from the authorized visitor list. The dissent indicates that the Corrections officials' decision to "permanently" revoke Mrs. Jackson's visitation privileges was "not . . . entitled to complete qualified immunity." No source, however, is cited in support of the proposition that the decision itself, rather than the communication of the decision, violated clearly established law.

8

According to Warden Humphrey, at the time the letters were sent, he and Assistant Commissioner Ward believed that the strike "was significantly disrupting the operation of the facility and jeopardizing the security and safety of staff and inmates." This belief was based, in part, on the Special Management Unit's inability to provide adequate security and medical assistance for the striking inmates, the additional staffing requirements that the strike demanded of the prison, and the health of those inmates refusing meals. Moreover, for the Corrections officials, the timing of Mrs. Jackson's visits with her husband after he had accepted food on July 6, and the resumption of the hunger strike immediately following her visits over the weekend of July 7 and 8, was a significant factor in their decision to terminate Mrs. Jackson's visitation privileges.

Mr. Jackson continued to strike until July 26, 2012, when he requested food, and the strike ended. His visitation privileges were restored, aside from those with his wife. Notably, Janice Jackson, Mr. Jackson's mother, who also participated in the June and July 2012 protests, including the July 16 protest at the Department of Corrections' headquarters, did not have her visitation privileges terminated and has been able to visit with Mr. Jackson.

Assistant Commissioner Ward stated that a reason for removing Mrs. Jackson from the visitation list was because the Corrections officials believed that she was influencing the hunger strike by encouraging her husband to prolong the

9

strike.  In addition, Assistant Commissioner Ward believed that Mrs. Jackson was the "conduit" or "avenue" through which her husband was "able to communicate disruptive actions and behaviors to incite others either inside or outside" the prison.

Thus, the Corrections officials were motivated to terminate Mrs. Jackson's visitation privileges by the hope that this would prevent her from continuing to encourage the prolongation of the hunger strike and prevent her from inciting disruptive behavior in other inmates within the prison, who were not housed in her husband's Special Management Unit, and in inmates housed at other state prison facilities.

Nonetheless, Assistant Commissioner Ward did not deny that Mrs. Jackson's participation in a protest without a permit and her demands for a meeting with the Department of Corrections commissioner were also factors in the Corrections officials' decision to terminate Mrs. Jackson's visitation privileges. Thus, the decision to terminate Mrs. Jackson's visitation privileges was also motivated, at least in part, by a desire to silence her.

On January 8, 2014, the District Court awarded summary judgment, based on qualified immunity, in favor of the Corrections officials, for their decision to terminate Mrs. Jackson's visitation privileges during the time of the hunger strike. The District Court, however, denied the Corrections officials summary judgment for the period following the end of the hunger strike and found that the question of

10

whether the Corrections officials continued to enjoy qualified immunity post-hunger strike was one for a jury.  The Corrections officials appealed to this Court, contending that the District Court erred in denying them qualified immunity for their actions in terminating Mrs. Jackson's visitation privileges with her husband.

## II.

We properly have "jurisdiction to hear this interlocutory appeal of the denial of qualified immunity as the issue involves the determination of whether the official[s'] conduct violated clearly established law."  Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (citing Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1286 (11th Cir. 2000)).  "We review de novo the district court's disposition of a summary judgment motion based on qualified immunity, resolving all issues of material fact in favor of Plaintiffs and then answering the legal question of whether Defendants are entitled to qualified immunity under that version of the facts."  West v. Tillman, 496 F.3d 1321, 1326 (11th Cir. 2007) (citing Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002)).

## A.

As an initial matter, we address Mrs. Jackson's efforts to contest the District Court's finding that the Corrections officials were entitled to qualified immunity during the period of the hunger strike, without having taken a cross-appeal.  In her

papers, Mrs. Jackson attempts to argue that the portion of the District Court's ruling that granted the Corrections officials summary judgment on the basis of qualified immunity was error.  In other words, Mrs. Jackson, despite her failure to cross-appeal, asks us to reconsider the District Court's order, insofar as it held that the Corrections officials were entitled to qualified immunity while Mr. Jackson and the other inmates were not accepting food.

Because the cross-appeal rule "implicates our subject matter jurisdiction, [it] accordingly must be addressed as a threshold matter" prior to the merits of its underlying claims.[6]  See Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003) (citing Juidice v. Vail, 430 U.S. 327, 331, 97 S. Ct. 1211, 1215 (1977)).

First, as noted, the Corrections officials' right to take what would otherwise be an interlocutory appeal is clear.  In qualified immunity cases, "[a] public official [sued in her individual capacity] may file an interlocutory appeal of the denial of qualified immunity where the disputed issue is whether the official's conduct violated clearly established law."  Leslie v. Hancock Cnty. Bd. of Educ., 720 F.3d

---

[6] Although the Supreme Court has refrained from holding whether the cross-appeal rule is "'jurisdictional,' and therefore exceptionless, or a 'rule of practice,' and thus potentially subject to judicially created exceptions," Greenlaw v. United States, 554 U.S. 237, 2445, 128 S. Ct. 2559, 2564 (2008), this Court, like many other courts of appeals, has found the rule to be jurisdictional.  See Christiansen v. McRay, 380 F. App'x 862, 863 (11th Cir. 2010); Art Midwest Inc. v. Atl. Ltd. P'ship XII, 742 F.3d 206, 211 (5th Cir. 2014); Zapata Indus. v. W.R. Grace & Co.-Conn., 34 F. App'x 688, 690 (Fed. Cir. 2002); Montgomery v. Carter Cnty., Tenn., 226 F.3d 758, 770 (6th Cir. 2000); Johnson v. Teamsters Local 559, 102 F.3d 21, 29 (1st Cir. 1996); EF Operating Corp. v. Am. Bldgs., 993 F.2d 1046, 1049 (3d Cir. 1993).

1338, 1344 (11th Cir. 2013) (alteration in original) (quoting Stanley, 219 F.3d at 1286) (internal quotation marks omitted).

Second, it is apparent that Mrs. Jackson could have filed a cross-appeal with respect to the District Court's grant of qualified immunity. In the absence of an appeal by the Corrections officials, Mrs. Jackson would have had to wait until after the trial to contest the summary judgment order. Because they did appeal, however, Mrs. Jackson's claims, with respect to qualified immunity, could be heard under our pendent appellate jurisdiction because "we 'may address [otherwise] nonappealable orders if they are inextricably intertwined with an appealable decision or if review of the former decision [is] necessary to ensure meaningful review of the latter.'" Hudson v. Hall, 231 F.3d 1289, 1294 (11th Cir. 2000) (alterations in original) (citations omitted) (quoting Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1335 (11th Cir. 1999)) (internal quotation marks omitted). Importantly, for a claim to fall within our pendent appellate jurisdiction, a party must file a cross-appeal of its own. See, e.g., id. at 1293–94; McQueen v. Johnson, 506 F. App'x 909, 911, 913–14 (11th Cir. 2013).

Here, Mrs. Jackson's claims are sufficiently intertwined with the issue on appeal that she could have filed a cross-appeal to attack the District Court's finding that the Corrections officials were entitled to qualified immunity. On appeal, the Corrections officials seek to extend the protections of qualified immunity to the

13

period following the end of the hunger strike.  For her part, Mrs. Jackson attempts to argue that qualified immunity should not have been granted to them at all.  Thus, the Corrections officials' appeal, challenging the denial of qualified immunity after the hunger strike ended, implicates the same facts and the same law that would be needed to decide whether the Corrections officials were entitled to qualified immunity in the first place.  See, e.g., Hudson, 231 F.3d at 1293–94 (finding claims to be inextricably intertwined where a police officer appealed the district court's denial of qualified immunity for his search of plaintiffs following a traffic stop, and the plaintiffs cross-appealed the district court's grant of qualified immunity to the police officer for the initial traffic stop, "[b]ecause the issues raised by [the plaintiffs'] cross-appeal [were] sufficiently related to and intertwined with [the police officer's] appeal").

Mrs. Jackson, however, did not cross-appeal and thus may not use the Corrections officials' appeal to increase her rights.  See El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 479, 119 S. Ct. 1430, 1434–35 (1999) ("Absent a cross-appeal, an appellee may 'urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court,' but may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'" (quoting United States v. Am. Ry. Express Co., 265 U.S. 425, 435, 44 S. Ct. 560, 564 (1924))).

14

Mrs. Jackson argues that the District Court erred in granting the Corrections officials qualified immunity during the hunger strike. Were she permitted to make this argument and were she to prevail, the result would both enlarge her rights and lessen those of the Corrections officials. Therefore, based on the cross-appeal rule, we may not entertain her arguments with respect to the District Court's grant of qualified immunity to the Corrections officials during the hunger strike.

### B.

As to the appeal of the Corrections officials themselves, "[q]ualified immunity offers complete protection [from suit] for . . . public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sherrod, 667 F.3d at 1363 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). "In deciding about qualified immunity, we are considering what an objectively reasonable official must have known at the pertinent time and place . . ." that the decision was made. Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010).

Moreover, "[w]here the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and preexisting law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity." Sherrod,

15

667 F.3d at 1364 (alteration in original) (quoting Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir. 1996)) (internal quotation marks omitted).  The parties do not dispute that the Corrections officials were acting in a discretionary capacity when they sent the letters terminating Mrs. Jackson's visitation privileges.  In addition, the Corrections officials acknowledge that Mrs. Jackson engaged in protected speech and conduct when she spoke at the rallies, and do not question Mrs. Jackson's claim that she suffered adverse action in the termination of her visitation with her husband.

Based on the record presented at summary judgment, the District Court found that, at the time that the letters were sent terminating Mrs. Jackson's visitation privileges, the Corrections officials were entitled to the protections of qualified immunity because they had a lawful reason for terminating Mrs. Jackson's visitation privileges, which was the motivation "at least in part" for their actions.

The District Court was correct in this conclusion.  The facts of this case demonstrate that Mr. Jackson had a considerable amount of influence over the other inmates and considered himself, and was viewed by others, to be the leader of the hunger strike.  The record also shows that, on July 6, Mr. Jackson and the other inmates accepted food, thus appearing to end their hunger strike.  Mr. Jackson was visited by his wife over the succeeding weekend and he was the only

16

one of the striking inmates to receive any visitors during that two-day period.

Following these visits, Mr. Jackson and seven other inmates resumed the hunger

strike.  In addition, intelligence gathered, such as an intercepted telephone call of

an inmate, suggested that Mrs. Jackson urged her husband to prolong the strike.

The record further demonstrates that the Corrections officials were legitimately

concerned that the strike might spread, about the disruption caused by the strike,

and about the security and safety of staff and inmates.[7]  Thus, the record supports

the conclusion that the Corrections officials' acts were motivated by lawful

considerations when they terminated Mrs. Jackson's visitation privileges.

The record also shows, however, that a reasonable jury could find that the

Corrections officials were motivated to terminate Mrs. Jackson's visitation

privileges, at least in part, by a desire to retaliate against Mrs. Jackson for her

involvement in the demonstrations about the prison's conditions.  That is, Mrs.

Jackson's demands for a meeting with the Department of Corrections

commissioner, and her participation in a protest that had no permit, were also

---

[7] The United States Supreme Court has acknowledged "that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management." Thornburgh v. Abbott, 490 U.S. 401, 407–08, 109 S. Ct. 1874, 1878–79 (1989) (quoting Procunier v. Martinez, 416 U.S. 396, 405, 94 S. Ct. 1800, 1807 (1974)).  As a result, the "Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." Id. at 408, 109 S. Ct. at 1879 (citing Martinez, 416 U.S. at 404–05, 94 S. Ct. at 1807).  Indeed, the Supreme Court has found that "[c]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." Bell v. Wolfish, 441 U.S. 520, 546–47, 99 S. Ct. 1861, 1878 (1979) (quoting Pell v. Procunier, 417 U.S. 817, 823, 94 S. Ct. 2800, 2804 (1974)) (internal quotation marks omitted).

motivating factors for terminating her visitation privileges.  Nonetheless, the law of this Circuit is that, where, as here, the facts assumed for summary judgment show both a lawful and unlawful motivation for the decision made by a government official, the official is entitled to qualified immunity.  Foy, 94 F.3d at 1535.  In other words, the mixed motive analysis examines whether reasonable officers could anticipate that their actions, based on both lawful and unlawful motives, would result in a violation of a clearly established law.  Employing this analysis, the District Court found that the Corrections officials were "protected by qualified immunity for their actions during the period of time surrounding the hunger strike."

With respect to the claim that the Corrections officials "continued to retaliate [against Mrs. Jackson] for her protected speech long after the hunger strike and any threat it posed had ended," however, the District Court held that, once the strike-related disruption had subsided, the Corrections officials' "asserted lawful basis for banning [Mrs. Jackson's] visitation during the hunger strike vanished."  Put another way, the District Court found that, once the hunger strike ceased, it was a question for the jury whether the Corrections officials were motivated solely by a desire to control Mrs. Jackson's freedom of speech.

The District Court should have granted the Corrections officials' motion for summary judgment on Mrs. Jackson's claims.  Here, the Corrections officials made

just one decision with respect to Mrs. Jackson's visitation privileges, the decision found in the July 19, 2012 letters. With respect to this decision, the Corrections officials' entitlement to the protections of qualified immunity should have been determined "at the time" that they sent the letters to Mr. and Mrs. Jackson. See Sherrod, 667 F.3d at 1364 (citing Stanley, 219 F.3d at 1294). This is the case even though the decision, like many decisions made by public officials, had consequences in the future.

The purpose for qualified immunity is to permit officials to act without fear of harassing litigation as long as they can reasonably anticipate before they act whether their conduct will expose them to liability. See Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (citing Lee, 284 F.3d at 1194). Indeed, "[i]f objective observers cannot predict—at the time the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages." Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013) (quoting Foy, 94 F.3d at 1534) (internal quotation marks omitted).

Thus, the entitlement to the protections of qualified immunity is judged based on the facts and the law present at the time that public officials make their decisions and does not take into account later facts or changes in the law. See, e.g., Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012) ("[W]hether an official

19

protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established <u>at the time it was taken</u>." (alteration in original) (emphasis added) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639, 107 S. Ct. 3034, 3038 (1987)) (internal quotation marks omitted)); <u>Pearson v. Callahan</u>, 555 U.S. 223, 232, 129 S. Ct. 808, 816 (2009) ("[I]f the plaintiff has satisfied this first step,[8] the court must decide whether the right at issue was 'clearly established' <u>at the time of defendant's alleged misconduct</u>." (emphasis added) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001))); <u>Youmans</u>, 626 F.3d at 563.[9]  Therefore, the District Court erred in its characterization of the Corrections officials' decision to terminate Mrs. Jackson's visitation privileges as having "<u>continued</u> [to] den[y Mrs. Jackson] visitation long after the end of the hunger strike."  Rather, the record

---

[8] The Supreme Court has set forth a two-step inquiry to determine whether a defendant is entitled to qualified immunity.  The Court has clarified, however, that these steps need not be analyzed sequentially.  <u>See</u> <u>Pearson</u>, 555 U.S. at 236, 129 S. Ct. at 818.  A court's qualified immunity analysis must determine (1) "whether 'the facts alleged show the officer's conduct violated a constitutional right,'" and (2) "whether the right was clearly established" at the time of the defendant's alleged misconduct.  <u>Id.</u> at 232, 129 S. Ct. at 816 (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)) (internal quotation marks omitted).

[9] The dissent questions the applicability of <u>Pearson</u> and <u>Youmans</u> to the facts of this case. We believe that these cases are on point because they find qualified immunity based on the law and facts at the time the public officials made the decisions in question and left the grant of qualified immunity in place despite later changes in the law.

establishes that the decision to terminate[10] Mrs. Jackson's visitation privileges was lawfully made when the letters were sent on July 19, 2012, and that the Corrections officials were therefore entitled to qualified immunity from suit for their decision.

Accordingly, the Corrections officials are entitled to qualified immunity for both the period during the hunger strike and for the period after the hunger strike ended.

## III.

Based on this Court's precedent, we hold that the District Court should have found that the Corrections officials were entitled to qualified immunity for the period after the hunger strike ended. Accordingly, to the extent that the District Court denied summary judgment, we reverse its order dated January 8, 2014, and remand to the District Court to enter judgment in the Corrections officials' favor.

**REVERSED AND REMANDED.**

---

[10] Mrs. Jackson omitted from her amended and second amended complaints a demand for any injunctive relief for restoration of her visitation privileges. Although injunctive relief had been sought in her original complaint, she now seeks only monetary damages.

HINKLE, District Judge, concurring:

I concur in the result and agree with most of the thorough primary opinion.  I write separately to address three points.

I

The case arises from the revocation of the plaintiff Delma Jackson's visitation privileges with her incarcerated husband.  Her husband was on a hunger strike.  The district court granted summary judgment for the defendant Corrections officials on Ms. Jackson's claim that the revocation violated the First Amendment.  The basis for the ruling was qualified immunity.  But the district court denied summary judgment on a different claim—a claim that the Corrections officials violated the First Amendment by failing to reinstate the visitation privileges after the hunger strike ended.  So far as the record shows, the Corrections officials still have not reinstated Ms. Jackson's visitation privileges.

The Corrections officials appealed.  Ms. Jackson did not cross-appeal.

Ms. Jackson asserts we should affirm for a reason different from that adopted by the district court.  Ms. Jackson says the original revocation of her visitation privileges violated the First Amendment, that this was so as a matter of clearly established law, and that the violation continued for as long as the revocation continued.  Ms. Jackson thus says, in effect, that qualified immunity

22

does not bar the revocation claim and that it necessarily follows that qualified immunity also does not bar any failure-to-reinstate claim.

The primary opinion concludes that Ms. Jackson's failure to cross-appeal forecloses this argument. I disagree. As is well established, an appellee can assert in support of a judgment any ground supporting the judgment, whether or not adopted by the district court. See, e.g., Blum v. Bacon, 457 U.S. 132, 137 n.5 (1982) ("[W]ithout filing a cross-appeal or cross-petition, an appellee may rely upon any matter appearing in the record in support of the judgment below.").

The primary opinion recognizes this principle but says it does not apply here because of another well established principle: an appellee who does not cross-appeal cannot expand the judgment beyond its terms. See, e.g., El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 479 (1999). That principle means that Ms. Jackson cannot obtain from this court a mandate directing the district court to vacate its unappealed order granting summary judgment for the Corrections officials on the revocation claim. But in my view, this principle does not prevent us from addressing all the issues properly raised on this appeal, including any argument by Ms. Jackson supporting the judgment under review. If it turns out that any opinion of this court addressing the issues that are properly here has the collateral effect of suggesting that any unappealed, interlocutory order is incorrect, so be it.

My disagreement with the primary opinion on this point makes no difference, because even if Ms. Jackson's argument is properly here, the argument fails on the merits.  The Corrections officials have qualified immunity from the revocation claim, as the district court correctly held.  On these facts, the primary opinion's conclusion that the Corrections officials have qualified immunity from any failure-to-reinstate claim plainly means they also have qualified immunity from the revocation claim.

II

On the primary opinion's view of the facts, the Corrections officials revoked Ms. Jackson's visitation privileges for both a lawful motive (preventing the security risk and harm to the institution that come with hunger strikes) and an unlawful motive (punishing Ms. Jackson for free speech for reasons unrelated to security and institutional harm).  The primary opinion says, "[T]he law of this Circuit is that, where, as here, the facts assumed for summary judgment show both a lawful and unlawful motivation for the decision made by a government official, the official is entitled to qualified immunity."  For this proposition the primary opinion cites Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir. 1996).  Another case supporting the statement is Stanley v. City of Dalton, Ga., 219 F.3d 1280 (11th Cir. 2000).

24

This indeed seems to be the law of the circuit.  But it should not be.  In a proper case, when it makes a difference, the issue should be revisited.

Consider a case in which a prisoner engages in misconduct and is also a Catholic.  After appropriate disciplinary proceedings, a correctional officer decides to put the prisoner in the special housing unit, motivated partly by the misconduct, and partly by the prisoner's religion.

Does the correctional officer have qualified immunity?  If the officer would have put the prisoner in the SHU regardless of the prisoner's religion, the answer is yes (so long as putting a prisoner in the SHU for misconduct of this kind would not have violated clearly established law).  But if the officer would have left a non-Catholic in the general population, the officer loses, both on the merits and on the issue of qualified immunity.  Nobody could believe it is constitutional to put a Catholic in the SHU when a non-Catholic would remain in the general population.

On one reading, Foy and Stanley and the statement from the primary opinion quoted above would afford qualified immunity to the officer who put the Catholic in the SHU, even if the officer would not have put a non-Catholic in the SHU.  That cannot be right.

In real life, of course, the facts are never as clear as in my hypothetical.  In a mixed-motive case, it is hard to know whether a factor was a but-for cause, on the one hand, or merely a motivating factor that did not change the result, on the other

25

hand.  When the issue is qualified immunity, the inclination is to give the benefit of the doubt to the official claiming immunity.  And the inclination further is to resolve the issue by granting summary judgment.  But in ruling on a summary-judgment motion, disputes in the evidence must be resolved, and all reasonable inferences must be drawn, in favor of the nonmoving party.  That is true when the issue is qualified immunity, just as when the issue is something else.  See, e.g., Tolan v. Cotton, 134 S. Ct 1861, 1866 (2014) ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant . . . .").

In my view, summary judgment is improper when (1) a plaintiff asserts that an officer took action based on a factor that, as a matter of clearly established law, could not constitutionally be considered, and (2) the record presents a genuine dispute over whether that prohibited factor was a but-for cause of the officer's challenged action.  In asserting the contrary, Foy and Stanley confuse the subjective standard that governs the merits (what was the officer's actual motivation for taking the challenged action?) with the objective standard that applies to qualified immunity (would a reasonable officer have known that taking action for that reason was unconstitutional?).  An officer's actual thought process does not always line up with what a reasonable officer could have thought.

None of this calls into question the primary opinion's conclusion that the Corrections officials are entitled to summary judgment here.  The record

26

establishes without genuine dispute that in prohibiting Ms. Jackson from visiting her husband, the Corrections officials were motivated at least in part by legitimate concern for institutional security and resources.  No clearly established law suggested that acting on that basis was unconstitutional.  On this record, a reasonable jury could find that Ms. Jackson's protected activities were a motivating factor in the decision to prohibit her from visiting, but a reasonable jury could not find that her protected activities were a but-for cause of the decision.

III

Finally, the primary opinion correctly notes that the Corrections officials made a single decision to revoke Ms. Jackson's visitation privileges and are entitled to qualified immunity for that decision.  The district court faulted the Corrections officials for failing to reinstate Ms. Jackson's visitation privileges, and the dissent agrees.  But Ms. Jackson did not ask the Corrections officials to reinstate her privileges.  In the second amended complaint, Ms. Jackson did not assert a separate failure-to-reinstate claim.  And on appeal, Ms. Jackson has not asked us to recognize a separate failure-to-reinstate claim.  Before us, Ms. Jackson relies instead on her assertion that her visitation privileges never should have been revoked in the first place.

The bottom line is this.  No clearly established law prohibited the Corrections officials from revoking Ms. Jackson's visitation privileges (as they

27

would have done even had she not engaged in protected activities), and no clearly established law obligated the Corrections officials to reinstate Ms. Jackson's visitation privileges in the absence of any request for reinstatement.  The officials are entitled to summary judgment ending the litigation in its entirety.

MARTIN, Circuit Judge, dissenting:

The majority awards qualified immunity to three Georgia Department of Corrections officials for their complete and permanent termination of Delma Jackson's visitation privileges with her inmate husband. The officials first revoked Mrs. Jackson's privileges based on her purported role in a prison hunger strike. But they did not restore her privileges when the strike ended on July 26, 2012. Neither did they reinstate her privileges when they returned visitation privileges to all others who had been denied visitation for the same reason. Indeed, by all accounts they have not restored her privileges to this day, nearly thirty months later. Because I am convinced that any stated legitimate penological purpose for revoking her privileges vanished sometime after the end of the hunger strike, and because qualified immunity cannot extend to protect the officials if their sole remaining motivation was to retaliate against Mrs. Jackson for her protected speech, I respectfully dissent.

I am not persuaded by the majority's conclusion that our qualified immunity analysis can only look to the initial revocation communicated by the July 19, 2012 revocation letters. Specifically, I reject the idea that we are permitted to consider only the July 19, 2012 communication of the decision (which did not include an end-date for the action, as required by GDOC operating procedures), and must ignore the ongoing impact of that decision which still prevents Mrs. Jackson from

29

seeing her husband now almost three years later. While certainly we must consider the letters, Mrs. Jackson's First Amendment retaliation claim is not so limited. As the District Court correctly noted, Mrs. Jackson challenged the <u>permanent</u> suspension of her privileges. The officials have the authority at any point to reinstate Mrs. Jackson's visitation privileges. Their continued failure to do so perpetuates the permanent suspension and should be considered as part of the qualified immunity analysis.

The District Court was right in observing that the officials did not offer any valid motivation for the permanent suspension of Mrs. Jackson's privileges once the hunger strike ended. The officials returned visitation privileges to every other prison visitor whose rights had been revoked during the hunger strike. They suggest that Mrs. Jackson's privileges were not restored due to incomplete paperwork. But even if that were true, Mrs. Jackson made clear her request to be able to visit her husband when she sought an injunction for reinstatement of her privileges nearly a year before her husband was allegedly given the proper paperwork. The officials knew then that Mrs. Jackson wanted her privileges back, but did not reinstate them.

The majority points out that qualified immunity is "judged based on the facts and the law present at the time that public officials make their decisions," not "tak[ing] into account later facts or changes in the law." Panel. Op. at 19. While

30

that may be true, all the cases they rely upon stand for the unremarkable principle that an officer who performs a single act which does not violate the law when performed, will not be stripped of that immunity just because of a later change in the law. See Messerschmidt v. Millender, 565 U.S. ___, ___132 S. Ct. 1235, 1244–45 (2012) (evaluating a police officers' search subject to a magistrate's warrant that was later held to be unconstitutionally overbroad); Pearson v. Callahan, 555 U.S. 223, 244–45, 129 S. Ct. 808, 822–23 (2009) (holding that officers did not lose the protection of qualified immunity when they relied on the existing legal standards at the time they acted, yet the law later changed); Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010) (per curiam) (holding that it was not clearly established that a police officer who delayed medical treatment of an arrestee's minor injuries for four hours during booking violated his constitutional rights). I do not read those holdings to apply here so as to prevent us from considering the officers' ongoing decisions to revoke and refuse to reinstate Mrs. Jackson's privileges. Neither do those cases stop us from evaluating whether the scope of the deprivation was reasonable at the time it was made.

The majority acknowledges that a decision that would warrant qualified immunity at the time it is made can have ongoing consequences. Panel Op. at 19. And I understand that qualified immunity can attach to inaction just as it does to actions. See Goebert v. Lee Cnty., 510 F.3d 1312, 1331 (11th Cir. 2007) (denying

31

qualified immunity to jail administrator for his inaction in timely providing pretrial detainee with medical care).  Our precedent does not require us to turn a blind eye when defendants' ongoing inaction causes harm, especially where, as here, it was the same defendants' earlier action that created the harm in the first place.  Our analysis should begin anew once changing circumstances do away with the justification first given.

Imagine a police officer who impounds a car because he suspects it was involved in a hit and run.  The police investigation later uncovers that a different car was used in the offense, but the officer does not release the impounded car to the owner for more than two years.  While the initial deprivation was justified, once it became clear that the impounded car was not involved in the crime, the officer's inaction—his failure to release it to the owner without an additional lawful motive—should no longer be protected by qualified immunity.  I read the majority's holding in this case to require us to look only at the initial decision to impound, with the officer then protected by qualified immunity for the entire sequence of events that follows.  I do not understand our precedent to dictate such a result.

Even if the majority were correct that the officials "made just one decision with respect to Mrs. Jackson's visitation privileges, the decision found in the July 19, 2012 letters," Panel Op. at 19, I would not hold that the decision is entitled to

32

complete qualified immunity.  The letters imposed a permanent revocation of Mrs. Jackson's visitation privileges.  GDOC Standard Operating Procedures require notice of the "reason for and length of the [revocation]."  The officers' stated reason for revocation was related to the hunger strike, but the letters contained neither a date on which the revocation would end nor a statement that the privileges would be reinstated when the hunger strike was over.  In light of those facts, I do not believe that defendants have offered a lawful motive for the breadth of the letters for purposes of qualified immunity.

I would affirm the District Court's partial grant of qualified immunity.